**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Aug 27 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SARAH K. MARLER**
Law Office of Christine A. Majewski
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Department of Child Services
Central Administration
Indianapolis, Indiana

**SHARON R. ALBRECHT**
DCS St. Joseph County Local Office
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF A.J-G., MINOR CHILD, AND HER MOTHER, S.J-G., | ) ) ) ) |
| | ) |
| S.J-G., | ) |
| | ) |
|     Appellant-Respondent, | ) |
| | ) |
|       vs. | )    No. 71A05-1112-JT-696 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
|     Appellee-Petitioner. | ) |

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable Peter J. Nemeth, Judge
The Honorable Barbara J. Johnston, Magistrate
Cause No. 71J01-1010-JT-259

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Respondent S.J-G. ("Mother") appeals the juvenile court's order terminating her parental rights to A.J-G. Mother alleges that the Indiana Department of Child Services ("DCS") did not provide sufficient evidence to support the termination of her parental rights. Mother also alleges that the juvenile court erred when it ordered her to complete additional services before entering its order terminating her parental rights. Concluding that the evidence was sufficient to support the termination of Mother's parental rights and that the trial court did not err in ordering Mother to complete additional services before entering its order terminating her parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

Mother has one child, A.J-G., at issue in this appeal.[1] A.J-G. was born on October 18, 2003. DCS first became involved with A.J-G. when she was six years old, after receiving a report that on January 10, 2010, Mother had been found naked, screaming, and clutching a crucifix in the closet of a local homeless shelter and was being transported to a local hospital. Mother later indicated that she had run out of her medication, and her family indicated that she has had multiple diagnoses of psychotic illness. The juvenile court held a detention hearing on January 13, 2010, at which it found that there was probable cause to determine that A.J-G. was a child in need of services ("CHINS"). On January 19, 2010, DCS filed a

---

[1] The termination of the parental rights of A.J-G.'s father is not at issue in this appeal.

petition alleging that A.J-G. was a CHINS.

In addition to the above-stated allegations, with respect to Mother, the CHINS petition alleged that "Mother [was] unable to care for [A.J-G.] at this time." Petitioner's Ex. A, p. 12. The CHINS petition further alleged that A.J-G. was "in need of care, treatment, or rehabilitation that [she was] not receiving." Petitioner's Ex. A, p. 12. A.J-G. was determined to be a CHINS after Mother failed to attend an initial hearing on the matter. Mother was subsequently ordered to take all medications as prescribed, maintain adequate housing, maintain a lawful source of income, and to participate in certain services, including individual and group counseling and visitation with A.J-G. The juvenile court appointed a Court Appointed Special Advocate ("CASA") for A.J-G., and maintained A.J-G.'s placement in foster care.

On October 22, 2010, DCS filed a petition seeking the termination of Mother's parental rights to A.J-G. On May 13, 2011, the juvenile court conducted an evidentiary termination hearing at which Mother appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to its claim that the continuation of the parent-child relationship posed a threat to A.J-G.'s well-being, including evidence of erratic behavior by Mother, a lack of stable living arrangements, a failure by Mother to remain medication compliant for any long period of time, and serious emotional issues displayed by A.J-G. The juvenile court also heard testimony outlining A.J-G.'s struggles adapting to new situations and learning to express her feelings and Mother's failure to attend group sessions, individual therapy, and visitation sessions with A.J-G. on a consistent basis.

3

DCS also provided evidence indicating that termination of Mother's parental rights was in A.J-G.'s best interests, and that its plan for the permanent care and treatment of A.J-G. was adoption.

On May 16, 2011, three days after the evidentiary hearing, the juvenile court issued an order instructing Mother to complete certain services before a status hearing on November 15, 2011. During the November 15, 2011 status hearing, the juvenile court heard updates from the parties regarding the progress Mother was making in some areas and the lack of progress in others. On December 6, 2011, the juvenile court entered an order terminating Mother's parental rights to A.J-G. Mother now appeals.

**DISCUSSION AND DECISION**

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical

4

development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

## I. Sufficiency of the Evidence

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

In order to involuntarily terminate a parent's parental rights, DCS must establish by

clear and convincing evidence that:

> (A) one (1) of the following exists:
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2010). Mother does not dispute that DCS presented sufficient evidence to support the first and fourth elements for termination: that A.J-G. had been removed from Mother for at least six months, and that there is a satisfactory plan for the care and treatment of A.J-G. However, Mother does claim that DCS failed to establish that the continuation of the parent-child relationship poses a threat to A.J-G.'s well-being and that termination of her parental rights is in A.J-G.'s best interests.

**A. Continuation of Parental Relationship Poses Threat to A.J-G.**

6

Mother argues that DCS failed to establish by clear and convincing evidence that the continuation of her parental relationship poses a threat to A.J-G.'s well-being.[2] In determining whether the continuation of a parental relationship poses a threat to a child's well-being, a juvenile court should judge a parent's fitness to care for her child as of the time of the termination proceeding, taking into consideration evidence of changed conditions. *Bester*, 839 N.E.2d at 152. However, the court must also consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Again, a court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *See In re T.F.*, 743 N.E.2d at 773. Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003) (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

Here, in determining that the continuation of Mother's parental relationship posed a threat to A.J-G.'s well-being, the juvenile court found as follows:

> [W]e are faced with a Mother who suffers from bipolar disorder and schizophrenia. She has aligned herself with persons who have physically and mentally abused her: most recently her ex-husband. [Mother] has been hospitalized three (3) times for psychotic breaks. She presents with a history of non-compliance with her required medications. [A.J-G.] has been severely damaged due to Mother's inability to maintain a regimen of medicine. Mother's therapist, Dee Strycker, has expressed her concern for the long-term

[2] In making this argument, Mother notes that the juvenile court did not make any findings or conclusions relating to whether the conditions resulting in A.J-G.'s removal from her care will be remedied or whether A.J-G. has, on two (2) separate occasions, been adjudicated a CHINS.

7

mental state of Mother and her repeated inconsistencies with medications. Mother was hospitalized in April of 2011 for erratic behavior. [A.J-G.] cannot be placed in an environment where more psychological injury is almost guaranteed. She must heal and be protected. Though the Court does consider Mother's current compliance with medication, it cannot overlook the history of this case.

Appellant's App. p. 15.

Mother does not contest the portion of the finding which indicates that she suffers from bipolar disorder and schizophrenia, has aligned herself with persons who have physically and mentally abused her, has been hospitalized three times for psychotic breaks, or presents with a history of non-compliance with her required medications. Rather, in challenging the above finding, Mother argues that the evidence is insufficient to prove that A.J-G. has been severely damaged by her inability to maintain a regimen of medicine. In support, Mother points to the juvenile court's statement regarding an apparent lack of positive progress in A.J-G's behavior.[3] Mother also points to testimony which indicates that the case workers and therapists acknowledge that it would likely be difficult for A.J-G. if Mother's parental rights were terminated, and that, at the time of the termination hearing, Mother was receiving strong support from family and her church pastor and was taking her medication as prescribed.

The juvenile court considered the fact that, as of the time of the termination hearing, Mother was compliant with her medication but noted that it could not overlook Mother's

---

[3] At one point during testimony regarding issues relating to A.J-G.'s behavior, the juvenile court stated the following: "Excuse me, am I crazy or has this child gotten worse since she's been detained? I am sorry, I mean, it sounds like she's getting worse and worse." Tr. p. 66. The witness then went on to describe how A.J-G.'s behavior was actually improving as she learned to deal with her feelings and emotions.

history of non-compliance and instability. The juvenile court heard evidence establishing the continuation of the parental relationship posed a threat to A.J-G.'s well-being. Case Manager Emily Habschmidt testified that she began working with A.J-G. when she was six and one-half years old. At that time, A.J-G. displayed behavioral and emotional issues and suffered from encopresis and enuresis evidenced by the fact that she would soil herself and urinate on herself at least once a day, sometimes multiple times a day. Case Manager Habschmidt testified that these issues continued until the evidentiary hearing. Case Manager Habschmidt further testified that A.J-G has experienced difficulty dealing with her emotional issues since being placed in a therapeutic foster home where she is encouraged to express herself. Over time, however, A.J-G. has begun learning how to express and process her emotions and has begun talking about her anger and sadness. Case Manager Habschmidt testified that at some point, A.J-G. was diagnosed with a mood disorder and had shown initial positive reaction to medication that she was started on approximately two weeks prior to the termination hearing. A.J-G. also takes medication for post-traumatic stress disorder. With respect to the continuation of A.J-G.'s relationship with Mother, Case Manager Habschmidt stated that while she believed it would be beneficial for A.J-G. to have some kind of relationship with Mother, she did not believe it would be in A.J-G.'s best interest to live with Mother because of Mother's behavioral inconsistencies.

A.J-G.'s therapist Elizabeth O'Conner testified that she began working with A.J-G. when she was six years old. At that time, O'Conner observed that A.J-G. suffered from encopresis and enuresis and experienced difficulty adjusting to life in a new environment. In

the beginning, A.J-G. expressed missing Mother and having difficulty with other children at school. Over time, A.J-G. began talking to O'Conner about situations that make her feel unsafe and alleged sexual abuse that she suffered in Mother's home by Mother's then-husband. A.J-G. also expressed sadness and confusion relating to Mother's inconsistent attendance at scheduled visits with A.J-G. O'Conner testified that in her opinion, A.J-G's primary problem is "not having a stable system and knowing what's going to come next" and that A.J-G. needs closure. Tr. p. 63. O'Conner opined that while there is no question that Mother loves A.J-G., the issue is Mother's apparent inability to provide the consistency and stability that A.J-G. requires. O'Conner expressed concerns relating to "the consistency and stability of [Mother] to be there for her daughter and bring her to appointments, getting her to where she needed to be, and also being there emotionally for her." Tr. p. 76.

Mother's counselor, Dee Strycker, testified that Mother's attendance at group and individual sessions was initially consistent, but "then had some trouble with consistency." Tr. p. 83. Strycker observed that Mother's compliance with her medication and attending appointments seems to run in cycles with Mother being in compliance for up to two months before having another setback. Strycker indicated that she believed that Mother needed to focus on her own health before she could be an effective parent. Strycker indicated that as of the date of the termination hearing, she had concern as to whether Mother was managing her bipolar disorder effectively.

In addition, DCS Case Manager Sarah Henry testified that while it is clear that A.J-G. and Mother love each other, Mother's inconsistent behavior puts A.J-G.'s safety in jeopardy.

10

Case Manager Henry further testified that she did not believe that the original reason for DCS's involvement, *i.e.*, Mother's unstable condition, had been remedied. She stated that:

> I'm concerned that there clearly are some cycles or it's happened more than once, knowing that it happened in Minnesota, that she was off medication and went naked to church, and was not and was not dressing [A.J-G.] appropriately for the weather, that she took her then knowing that we have had three hospitalizations in just over a year that we have been involved. [Mother]'s had family support in and out of her life, she had her father with her in Minnesota, she moved to be with some family. She was with [her sister] and that family down in Indianapolis for awhile. So, she'll be around family support, be medication compliant, be stable, and then some things will happen that she'll not be with family again, that she won't take the medication. And for those reasons, I don't feel confident that she will stay with the family support that she has right now and stay mediation compliant.

Tr. pp. 159-60. Case Manager Henry stated that Mother has failed to provide A.J-G. with a stable living environment as is evidenced by the fact that, within the past few years, Mother has moved eleven times to nine different residences. All of the caseworkers and service providers agreed that Mother cannot provide proper care and supervision for A.J-G. when she is not medication compliant.

When considered as a whole, we conclude that the evidence is sufficient to demonstrate a reasonable probability that the continuation of Mother's parental relationship would pose a threat to A.J-G.'s well-being. It was within the province of the juvenile court, as the finder of fact, to minimize any contrary evidence of changed conditions in light of its determination that Mother's failure to provide a safe and stable living environment where A.J-G. could feel secure was unlikely to change. *See In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*. Moreover, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as

11

Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Mother's claim effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

### B. Termination in A.J-G's Best Interests

Next, we address Mother's claim that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in A.J-G.'s best interests. We are mindful that in determining what is in the best interests of the child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id*.; see also *Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

Here, the testimony establishes that A.J-G. has a need for permanency and stability and that the termination of Mother's parental rights would serve her best interests. Case Manager Henry testified that while she believes that Mother and A.J-G. could potentially maintain some form of relationship, A.J-G.'s best interests would be served by the termination of Mother's parental rights because A.J-G. has a need for permanency and

stability and Mother has failed to demonstrate that she is capable of staying medication compliant and providing A.J-G. with said permanency and stability. In discussing A.J-G.'s need for permanency and stability, Case Manager Henry, as well as the other service providers, indicated that A.J-G. has displayed signs of nervousness about the uncertainty of what is coming next and would benefit from a sense of permanency. Case Manager Henry further testified that both A.J-G.'s maternal grandfather and her current foster mother are possible candidates to adopt A.J-G., as both can likely provide A.J-G. with a sense of stability and emotional support that Mother, when medication non-compliant, is unable to provide.

In addition, A.J-G.'s therapist, O'Conner, testified that she believed the termination of Mother's parental rights is in A.J-G.'s best interests because

> [A.J-G.] needs someone who can be consistent and stable, and support her and help her with her own mood swings and difficulties that she has. And my concern is that I … don't know that mom can handle that at this time.

Tr. p. 62. O'Conner opined that A.J-G's primary problem is "not having a stable system and knowing what's going to come next" and that A.J-G. needs closure and that while there is no question that Mother loves A.J-G., the issue is Mother's apparent inability to provide the consistency and stability that A.J-G. requires. Tr. p. 63.

The juvenile court did not have to wait until A.J-G. was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of Case Manager Henry and O'Conner, we conclude that the evidence is sufficient to satisfy

13

DCS's burden of proving that termination of Mother's parental rights is in A.J-G.'s best interests.

Moreover, in arguing that the evidence was insufficient to support the juvenile court's determination that the termination of her parental rights is in A.J-G.'s best interests, Mother alleges that the termination of her parental rights would cause A.J-G. to suffer pain. Specifically, Mother claims that A.J-G. would suffer pain because the evidence has shown that she and A.J-G. love each other and the case managers and service providers have indicated that it would likely be beneficial to both Mother and A.J-G. to maintain some form of relationship. While each of the case workers and service provides agreed that it could be beneficial for Mother and A.J-G. to maintain some form of relationship, each also agreed that given the uncertainty surrounding Mother's mental state and her inability to provide A.J-G. with the necessary sense of safety and stability, termination of Mother's rights was in A.J-G.'s best interests. Thus, Mother's claim in this regard amounts to an invitation for this court to reweigh the evidence, which again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## II. Whether the Juvenile Court Erred in Ordering Mother to Complete Certain Services Before Entering its Order Terminating Mother's Parental Rights

Mother also contends that the juvenile court erred in ordering her to complete certain services before a status hearing, after which it entered its order terminating her parental rights to A.J-G. DCS, for its part, argues that the juvenile court did not err as it allowed Mother one last opportunity to show progress before terminating her rights, and Mother was not prejudiced by this opportunity. Mother claims that, in termination proceedings, the juvenile court does not have the authority to order a parent to complete additional services and by

14

doing so, is "in essence saying that DCS had not proven by clear and convincing evidence that Mother's parental rights should be terminated." Appellant's Br. p. 12. Mother, however, has failed to provide any authority supporting this claim. Thus, in light of our above-stated conclusions that the evidence was, in fact, sufficient to sustain the termination of Mother's parental rights, we cannot say that the juvenile court erred by seemingly giving Mother one last chance to show improvement before terminating her parental rights to A.J-G.

Furthermore, even if we were to decide that the juvenile court erred in providing Mother one last opportunity to show improvement by completing additional services before terminating her parental rights to A.J-G., any challenge to the juvenile court's order that Mother complete additional services and the admission of additional evidence relating to said services during a subsequent progress hearing has been waived as Mother did not object to either the juvenile court's order that she complete additional services or the admission of any evidence during the subsequent progress hearing. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (citing *Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006)), *trans. denied*. Furthermore, the record demonstrates that both DCS and Mother, though their attorneys, presented evidence during the subsequent progress hearing demonstrating progress made by Mother in some areas and a lack of progress in others. Mother has failed to show how she was prejudiced by additional time to improve her health and parenting skills or by the admission of additional evidence relating to Mother's progress or lack thereof. As such, we cannot say that the juvenile court erred in this regard.

The judgment of the juvenile court is affirmed.

ROBB, C.J., and BAKER, J., concur.